# EXHIBIT A

Klehr Harrison Harvey Branzburg LLP
William A. Harvey (PA I.D. No. 25344)
Monica Matias Quinones (PA I.D. No. 330684)
1835 Market Street | Suite 1400
Philadelphia, Pennsylvania 19103
215.569.2700
wharvey@klehr.com
mmatias@klehr.com
*Attorneys for Plaintiffs*



*Filed and Attested by the
Office of Judicial Records
12 MAR 2025 11:28 am
E. SMITH*

### COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA

| | |
|---|---|
| STANLEY B. TULIN AND RIKI TULIN<br>1310 WRENFIELD WAY<br>VILLANOVA, PA 19085<br><br>PLAINTIFFS,<br><br>V.<br><br>J.P. MORGAN CHASE NATIONAL CORPORATE<br>1650 MARKET STREET, 47TH FL.<br>PHILADELPHIA, PA 19103<br>AND<br><br>J.P. MORGAN INVESTMENT MANAGEMENT INC.<br>1650 MARKET STREET, 47TH FL.<br>PHILADELPHIA, PA 19103<br>AND<br><br>J.P. MORGAN PRIVATE WEALTH ADVISORS LLC<br>1650 MARKET STREET, 47TH FL.<br>PHILADELPHIA, PA 19103<br><br>AND<br><br>JPMORGAN CHASE & CO.<br>1650 MARKET STREET, 47TH FL.<br>PHILADELPHIA, PA 19103<br><br>AND<br><br>JP MORGAN CHASE BANK, N.A. D/B/A CHASE<br>1650 MARKET STREET, 47TH FL.<br>PHILADELPHIA, PA 19103<br><br>DEFENDANTS. | CIVIL DIVISION<br><br>August Term, 2024<br><br>No. 240801933<br><br>**Jury Trial Demanded** |

Case ID: 240801933

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*

**Philadelphia Bar Association**
**Lawyer Referral**
**and Information Service**
**1101 Market St., 11th Floor**
**Philadelphia, Pennsylvania 19107**
**(215) 238-6333**

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

*Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*

**Asociacion De Licenciados**
**De Filadelfia**
**Servicio De Referencia E**
**Informacion Legal**
**1101 Market St., 11th Piso**
**Filadelfia, Pennsylvania 19107**
**(215) 238-6333**

Klehr Harrison Harvey Branzburg LLP
William A. Harvey (PA I.D. No. 25344)
Monica Matias Quinones (PA I.D. No. 330684)
1835 Market Street  |  Suite 1400
Philadelphia, Pennsylvania 19103
215.569.2700
wharvey@klehr.com
mmatias@klehr.com
*Attorneys for Plaintiffs*

## COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA

| | |
|---|---|
| STANLEY B. TULIN AND RIKI TULIN<br>1310 WRENFIELD WAY<br>VILLANOVA, PA 19085<br><br>PLAINTIFFS,<br><br>V.<br><br>J.P. MORGAN CHASE NATIONAL CORPORATE<br>1650 MARKET STREET, 47TH FL.<br>PHILADELPHIA, PA 19103<br>AND<br><br>J.P. MORGAN INVESTMENT MANAGEMENT INC.<br>1650 MARKET STREET, 47TH FL.<br>PHILADELPHIA, PA 19103<br>AND<br><br>J.P. MORGAN PRIVATE WEALTH ADVISORS LLC<br>1650 MARKET STREET, 47TH FL.<br>PHILADELPHIA, PA 19103<br><br>AND<br><br>JPMORGAN CHASE & CO.<br>1650 MARKET STREET, 47TH FL.<br>PHILADELPHIA, PA 19103<br><br>AND<br><br>JP MORGAN CHASE BANK, N.A. D/B/A CHASE<br>1650 MARKET STREET, 47TH FL.<br>PHILADELPHIA, PA 19103<br><br>DEFENDANTS. | CIVIL DIVISION<br><br>August Term, 2024<br><br>No. 240801933<br><br>**Jury Trial Demanded** |

## COMPLAINT

Case ID: 240801933

Plaintiffs, Stanley B. Tulin ("Mr. Tulin") and Riki Tulin ("Mrs. Tulin" and together with Mr. Tulin, "Plaintiffs" or the "Tulins"), by and through their undersigned counsel, hereby bring this Complaint against J.P. Morgan Chase National Corporate Services Inc., J.P. Morgan Investment Management Inc., J.P. Morgan Private Wealth Advisors LLC, JPMORGAN Chase & Co., and JP Morgan Chase Bank, N.A. d/b/a Chase ("Chase"),[1] and aver as follows:

## INTRODUCTION

1.      This is not just a case of financial mismanagement—this is a story of betrayal, negligence, and the ruination of a family's security. Stanley Tulin, a retired executive who spent his life building a career to ensure his family's well-being, entrusted his hard-earned wealth to those he believed would safeguard it. Instead, he and his wife, Riki Tulin, became victims of a ruthless fraud—a Ponzi scheme led by Scott Mason ("Mason"), with the full assistance and complicity of J.P. Morgan. This betrayal has shattered their sense of security and threatens their ability to live out their golden years as they had always envisioned.

2.      At 75 years old, the Tulins depend on the wealth they've accumulated over a lifetime to live comfortably in retirement. They have three children and four grandchildren whom they support from time to time, ensuring their legacy continues. But that legacy has been ripped from them—not by their own mistakes, but by those they trusted to manage their wealth. The fraudulent actions of Mason, aided by the reckless indifference, negligence, and complicity of J.P. Morgan, have drained the Tulins' accounts and left them struggling to recover the funds they once relied on.

3.      What the Tulins did not know was that, for years, Mason had been siphoning off their hard-earned savings with the assistance of J.P. Morgan.

---

[1] J.P. Morgan Chase National Corporate Services Inc., J.P. Morgan Investment Management Inc., J.P. Morgan Private Wealth Advisors LLC, JPMORGAN Chase & Co., and Chase will be hereinafter collectively referred to as "J.P. Morgan."

Case ID: 240801933

4.    Plaintiff reasonably relied on J.P. Morgan, one of the largest and most sophisticated financial institutions in the world, to act as a bulwark against fraud and misconduct. Yet J.P. Morgan utterly failed to meet even the most basic standards of care. Through negligence and willful and reckless disregard for their duties, the J.P. Morgan entities at issue facilitated the theft of millions of dollars from Plaintiffs' accounts, approving unauthorized transactions, and ignoring glaring red flags.

5.    To make matters worse, J.P. Morgan, despite owing fiduciary duties to the Tulins, enabled Mason's fraudulent actions, which involved making renewing and making unauthorized charges against a line of credit the Tulins believed had been fully paid off. Now, in their later years, the Tulins are seeking to recover the funds that should have been safeguarded, hoping to regain the financial security they lost and live out their retirement free from the fear of financial ruin.

6.    It was not until 2024—after an FBI investigation—that the Tulins learned of the extensive fraud that had been perpetrated against them.

7.    The emotional and financial toll this fraud has taken on the Tulins cannot be overstated. The anguish of knowing that the very individuals and institutions they trusted with their wealth turned their backs on them at the most vulnerable time of their lives is incomprehensible. The harm caused by J.P. Morgan's failure to protect them from fraud has left them not just financially devastated but emotionally scarred. They now seek justice—not only for the financial loss they have suffered but also to hold J.P. Morgan accountable for their gross negligence and the betrayal of trust that has upended their lives.

## PARTIES

8.    Stanley B. Tulin and Riki Tulin are husband and wife of over forty-nine years, with a primary residence located at 1310 Wrenfield Way, Villanova, Pennsylvania 19085.

Case ID: 240801933

9.      Upon information and belief, J.P. Morgan Chase National Corporate Services Inc. is a New York corporation with an office at 1650 Market Street, 47th Fl. Philadelphia, PA 19103. J.P. Morgan Chase National Corporate Services Inc. is registered to do business in Pennsylvania.

10.     Upon information and belief, J.P. Morgan Investment Management Inc. is a Delaware corporation with an office at 1650 Market Street, 47th Fl. Philadelphia, PA 19103. J.P. Morgan Investment Management Inc. is registered to do business in Pennsylvania.

11.     Upon information and belief, J.P. Morgan Private Wealth Advisors LLC is a Delaware corporation with an office at 1650 Market Street, 47th Fl. Philadelphia, PA 19103. J.P. Morgan Private Wealth Advisors LLC is registered to do business in Pennsylvania.

12.     Upon information and belief, JPMORGAN Chase & Co. is a Delaware corporation with an office at 1650 Market Street, 47th Fl. Philadelphia, PA 19103. JPMORGAN Chase & Co. is registered to do business in Pennsylvania.

13.     Upon information and belief, Chase is a national bank association and subsidiary of JPMORGAN Chase and Co. Chase has an office located at 1650 Market Street, 47th Fl. Philadelphia, PA 19103. Chase directs and regularly transacts business in Philadelphia.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 42 Pa. C.S. § 931.

15.     Venue is proper in this Court pursuant to Pennsylvania Rule of Civil Procedure 2179 because Defendants regularly conduct business in Philadelphia.

## FACTS

### A. Background

16.     Stanley Tulin and his wife, Riki Tulin, are both 75 years old. They are a dedicated and philanthropic couple, deeply involved in numerous charitable organizations. Their contributions span a variety of causes, including the U.S. Holocaust Memorial Museum, the Simon

Case ID: 240801933

Wiesenthal Center, the National Constitution Center, the Jewish Theological Seminary, Solomon Schechter and Perelman Day Schools, Barrack Hebrew Academy, and the Adath Israel synagogue.

17.    Mr. Tulin spent his life working hard and saving for retirement, a time that the Tulins had hoped would allow them to enjoy peace and security. Mr. Tulin retired more than 18 years ago, after a long and distinguished career.

18.    Beginning in 1971, Mr. Tulin worked as a consulting actuary before becoming Senior Executive Vice President and Chief Financial Officer of Equitable Financial in 1996. In 1998, he also assumed the role of Vice Chairman and Director of Equitable Life, a subsidiary of Equitable Financial.

19.    In all of these roles, Mr. Tulin earned salaries and benefits exceeding $3 million per year. He served on the Executive Committee of AXA Group—a global financial services company—from 2000 through his retirement.

20.    After retiring, Mr. Tulin consulted for AXA Financial—at that time, a subsidiary of AXA Group—through 2011 at an annual salary of approximately $500,000.

21.    The Tulins have three children and four grandchildren whom they occasionally support, using their hard-earned wealth to help ensure their family's finances. They have always been careful with their finances, knowing that their retirement savings are their only source of income.

22.    In the late 1990's, Mr. Tulin engaged Mason to serve as his investment advisor and protect his wealth for the benefit of his family.

23.    At all relevant times, Mason acted in a fiduciary capacity to the Tulins.

24.    When the Tulins engaged Mason as their investment advisor, they did so with the understanding, after having provided Mason with explicit instructions, that Mason would pursue an extremely conservative investment strategy. Specifically, Mr. Tulin directed Mason to invest in

Case ID: 240801933

government and/or tax-exempt bonds, ensuring that the Tulins' wealth would grow securely with limited financial risk.

25. Mason also served as Mr. Tulin's administrative assistant charged with paying the bills, his charitable contributions, his children's and grandchildren's schools, and related family expenses. Mason's wife, Lynne Mason, assisted Mason with these duties.

26. Over the years, the Tulins' net worth increased and/or should have increased to more than thirty million dollars as a result of Mr. Tulins' significant compensation and the return his investment bonds generated or should have generated (if it were not for Mason and J.P. Morgan's acts as described below).

27. Yet, in the years that followed, Mason and J.P. Morgan facilitated the slow draining of the Tulins' savings. Despite clear instructions and expectations, the Tulins remained unaware of the growing fraud until 2024, when they received an alarming call from the FBI.

28. What the Tulins discovered was nothing short of a nightmare. Through the help of J.P. Morgan, Mason, along with the advisory firm Rubicon Wealth Management LLC ("Rubicon"), which he owns and controls, had secretly diverted millions of dollars from the Tulins' accounts into his own personal holdings. The fraud, however, went beyond unauthorized transfers—it also involved the unauthorized renewal and illicit withdrawal of millions of dollars from a line of credit that the Tulins believed had been fully paid off and closed.

**B. J.P. Morgan and Mason Negligently and/or Fraudulently Drain the Tulins' Resources**

29. Over the years, Plaintiffs entrusted J.P. Morgan with substantial funds, with the understanding that these funds would be securely held for the benefit of the Tulins and their family.

30. The Tulins maintained multiple accounts with J.P. Morgan, including accounts ending in x1009 and x9918, and for years, they trusted that these accounts were secure.

Case ID: 240801933

31.    In connection with J.P. Morgan's services, the Tulins and J.P. Morgan entered into various agreements covering the rights, responsibilities, and fiduciary obligations of J.P. Morgan in connection with the management of the Tulins' accounts.[2]

32.    From at least on or about February 2007 through the end of 2024, Mason, with the assistance of J.P. Morgan, made over $19,000,000 in unauthorized transfers from two of the Tulins' accounts at J.P. Morgan (accounts ending in x1009 and x9918) to accounts owned or controlled by Mason.

33.    By way of example, on or around May 2013, Mason made four wire transfers totaling $150,000 from the Tulins' J.P. Morgan account x1009 to Bancorp x3680, an account maintained by Rubicon. Based on available information, the $150,000 transferred to Rubicon's account was later moved to Rubicon's payroll and Bancorp accounts in Mason's name. It is believed that Mason then used the fraudulently obtained $150,000 to make credit card payments, cover utility bills, shop, and pay student loans. This transaction is just one of numerous fraudulent actions carried out by Mason.

34.    By way of further example, from at least December 2016 through early 2024, Mason, with the assistance of J.P. Morgan, made at least $1,823,500 in unauthorized transfers from J.P. Morgan accounts x1009 and x9918 to Orchard Park Real Estate Holdings LLC ("Orchard Park"), a limited liability company owned and controlled by Mason. These unauthorized wire transfers included but were not limited to:

---

[2] The Tulins do not have executed copies of the relevant agreements but believe J.P. Morgan should have executed copies of the relevant agreements in their possession. Accordingly, the Tulins are not attaching the relevant agreements to this Complaint but expect J.P. Morgan to produce the relevant agreements during discovery. The Tulins will amend their Complaint to attach the relevant agreements following the production of such agreements.

Case ID: 240801933

| Date | Tulin Account | Amount |
|------|:-------------:|--------|
| December 22, 2016 | x1009 | $125,000.00 |
| August 15, 2017 | x1009 | $300,000.00 |
| November 1, 2017 | x1009 | $25,000.00 |
| November 6, 2017 | x1009 | $50,000.00 |
| November 13, 2017 | x1009 | $50,000.00 |
| December 21, 2017 | x1009 | $15,000.00 |
| March 28, 2018 | x1009 | $225,000.00 |
| April 16, 2018 | x1009 | $100,000.00 |
| June 12, 2018 | x1009 | $100,000.00 |
| August 17, 2018 | x1009 | $50,000.00 |
| September 26, 2018 | x1009 | $25,000.00 |
| October 26, 2018 | x1009 | $25,000.00 |
| November 20, 2018 | x1009 | $15,000.00 |
| December 10, 2018 | x1009 | $50,000.00 |
| January 17, 2020** | x1009 | $7,500.00 |
| January 28, 2020 | x1009 | $200,000.00 |
| November 20, 2020 | x1009 | $15,000.00 |
| June 17, 2021 | x1009 | $25,000.00 |
| June 21, 2021 | x1009 | $125,000.00 |
| October 29, 2021 | x9918 | $7,500.00 |
| December 9, 2021 | x9918 | $5,000.00 |
| May 27, 2022 | x9918 | $12,500.00 |
| June 1, 2022 | x9918 | $7,500.00 |
| August 25, 2022 | x9918 | $7,500.00 |
| August 29, 2022 | x9918 | $2,500.00 |
| September 13, 2022 | x9918 | $7,500.00 |
| November 7, 2022 | x1009 | $25,000.00 |
| November 14, 2022 | x1009 | $15,000.00 |
| November 18, 2022 | x1009 | $15,000.00 |

35.     To facilitate these fraudulent transactions, Mason orchestrated the diversion of all account statements to himself, rather than forwarding them to the Tulins. Moreover, he supplied the Tulins with fraudulent IRS Form 1099s and fabricated account statements to further obscure his deceptive actions.

36.     In addition to his own deceitful actions, Mason enlisted the help of others, such as J.P. Morgan, to facilitate the fraud. Despite the obvious signs of misconduct, J.P Morgan failed to intervene or stop the fraud, allowing it to continue unchecked for years.

37.     Mason was never authorized to withdraw funds on behalf of the Tulins.

Case ID: 240801933

38.     Despite Mason's failure to provide J.P. Morgan with documentation evidencing any sort of valid authority to withdraw funds on behalf of the Tulins, J.P. Morgan facilitated transfers from the Tulins' accounts to accounts controlled by Mason, including, upon information and belief, transfers from the Plaintiffs' J.P. Morgan accounts to Mason's personal J.P. Morgan account.

39.     Upon information and belief, J.P. Morgan either failed to implement commercially reasonable security procedures to prevent fraudulent transactions or neglected to follow its established security protocols, thereby enabling Mason to unlawfully transfer funds from the Tulins' accounts.

40.     Upon information and belief, J.P. Morgan is also implicated in making material misstatements, misrepresentations, and omissions to the Tulins. These false statements and omissions were made to further Mason's fraudulent scheme, effectively misleading the Tulins and preventing them from uncovering the true nature of the fraud. J.P. Morgan's actions, and lack thereof, were integral to the success of Mason's deceit, as they helped create a false narrative and obscured the truth about the fraudulent transfers and unauthorized actions taking place with the Tulins' accounts.

41.     Over the course of at least multiple years, Mason and Rubicon transferred millions of dollars from Plaintiffs' J.P. Morgan accounts to accounts controlled by Mason, often forging Plaintiffs' signature or using fraudulent forms.  Upon information and belief, Mason used the fraudulently transferred funds to finance his lavish lifestyle, diverting the Tulins' money for personal expenses and indulgences, rather than for the purposes it was intended.

42.     Despite numerous red flags, J.P. Morgan failed to intervene and/or prevent Mason's fraudulent actions. Instead, J.P. Morgan authorized multiple large transfers to accounts with no legitimate connection to the Plaintiffs, all of which were owned and controlled by Mason.

Case ID: 240801933

43.    J.P. Morgan also neglected to verify signatures on transfer requests and ignored clear irregularities that should have raised alarms for any reasonable institution about potential fraud.[3]

44.    J.P. Morgan's actions and inactions enabled Mason to deceive and exploit the Tulins, who had trusted both him and the financial institutions involved.  By failing to intervene, J.P. Morgan enabled Mason to misappropriate the Plaintiffs' funds for his personal expenses, rather than for the legitimate purposes for which the funds were intended.

45.    J.P. Morgan's failure to take action when confronted with signs of fraud went beyond mere oversight. At various points, the bank was made aware, either through red flags or other means, that Mason was engaging in unauthorized and suspicious transactions, such as transferring money to accounts owned or controlled by Mason. Instead of investigating these matters, J.P. Morgan's response was to facilitate the fraudulent transactions. J.P. Morgan's omissions in failing to inform the Tulins of the suspicious and fraudulent transactions further enabled Mason's illegal actions.

## C.  J.P. Morgan's Failure to Investigate Unauthorized and Fraudulent Transactions on the Line of Credit

46.    On or about 2010, the Tulins secured a line of credit from J.P. Morgan (the "Line of Credit") to assist their daughter with the purchase of a house.

47.    As a financially responsible family, the Tulins promptly repaid the amount borrowed from the Line of Credit.

48.    After paying off the debt associated with the Line of Credit, the Tulins were led to believe the Line of Credit account had been closed.

---

[3] The damage calculations in this Complaint—as well as the means and methods of J.P. Morgan's negligence and fraud—are preliminary and will be supplemented upon discovery of additional facts.

Case ID: 240801933

49.    However, unbeknownst to them, Mason and J.P. Morgan continued to benefit from the Line of Credit to the detriment of the Tulins.

50.    Although the Tulins never authorized the renewal or any additional transactions or withdrawals from the Line of Credit, upon information and belief, Mason submitted forged documents with the Tulins' signatures to J.P. Morgan as part of applications to extend the Line of Credit.

51.    Despite Mason's efforts to conceal his actions, J.P. Morgan was on notice that the Line of Credit had been renewed under suspicious circumstances, as the renewal documents themselves contained discrepancies, including forged signatures from the Tulins and questionable notary certifications.

52.    These red flags should have prompted any reasonable institution to conduct a thorough investigation. Once again, however, J.P. Morgan failed to conduct due diligence to ascertain whether the signatures were authentic or whether Mason had obtained the Tulins' authority to extend and/or renew the Line of Credit.

53.    Upon information and belief, despite lacking proper authorization, J.P. Morgan allowed Mason to continue drawing millions of dollars from the Line of Credit without proper authorization.

54.    Over the years, Mason perpetuated the fraudulent scheme by making unauthorized payments from the Tulins' J.P. Morgan x1009 account to cover the interest accrued on the Line of Credit, without the Tulins' knowledge or consent.

55.    Upon discovering the fraudulent transactions related to the Line of Credit, the Tulins were compelled to liquidate significant assets to cover the substantial debt. This payment, made under duress and without a full understanding of the underlying facts, was a necessary action for the Tulins, who found themselves vulnerable and without recourse at the time.

Case ID: 240801933

56.     Upon information and belief, J.P. Morgan played a significant role in facilitating the theft of the Tulins' money through a series of failures, including, but not limited to: (1) a blatant disregard for basic due diligence, allowing Mason to carry out his fraudulent activities unchecked; (2) a failure to implement or follow commercially reasonable security procedures to verify the authenticity of the documents and signatures Mason submitted, despite the existing clear red flags; (3) neglecting to require legally binding authorization before granting Mason access to the Tulins' accounts, which would have served as a safeguard against unauthorized actions; (4) permitting the unauthorized renewal of the Line of Credit and the initiation of unauthorized transactions from the Line of Credit; and (5) failing to notify the Tulins of suspicious activity related to their accounts, thereby allowing the fraudulent scheme to persist without their knowledge. These lapses in standard banking protocols directly contributed to the misappropriation of the Tulins' funds.

57.     As a financial institution, J.P. Morgan had a legal obligation to monitor and report Mason's suspicious activities, including the clearly questionable transfers of funds from the Tulins' personal accounts to accounts controlled by Mason, as well as the transactions associated with the Line of Credit. However, J.P. Morgan either failed to take any meaningful action to investigate and learn of Mason's fraudulent activities, or, even more concerning, they may have knowingly ignored red flags, choosing not to file the required regulatory reports or take the necessary steps to prevent further misappropriation of the Tulins' funds. This failure to act not only violates banking protocols but also directly enabled Mason's fraudulent scheme to continue unchecked.

58.     Had J.P. Morgan conducted the most basic of inquiries, it would have learned that the documents submitted by Mason were fraudulent and contained forged signatures. Furthermore, J.P. Morgan would have discovered that the Tulins did not authorize the transactions at issue.

59.     Upon information and belief, despite the inherently suspicious nature of Mason's activity, J.P. Morgan intentionally failed to investigate or stop the misappropriation of the Tulins'

Case ID: 240801933

funds and instead, allowed Mason to misappropriate the Tulins' funds, to the detriment of the Tulins and their family.

60.     As a result of J.P. Morgan's actions (and inactions), Mason and Rubicon unlawfully transferred millions of dollars from the Tulins' J.P. Morgan accounts to Mason and Rubicon's accounts.

61.     Furthermore, as a direct result of the actions of Mason and J.P. Morgan, the Tulins suffered substantial financial losses, totaling millions of dollars, due to the lost investment income that the funds they intended to invest in bonds would have earned over the years. Had their money been properly managed and invested as originally intended, it would have generated significant returns. Instead, the fraudulent actions that led to the misappropriation of their funds deprived them of the opportunity to benefit from these potential gains, exacerbating the financial harm caused by Mason and J.P. Morgan's actions.

62.     Upon information and belief, during the commission of Mason's fraudulent acts, J.P. Morgan became aware of Mason's fraudulent acts. Despite this, J.P. Morgan continued assisting and facilitating the commission of Mason's fraudulent acts.

63.     The Tulins did not discover Mason and J.P. Morgan's unlawful actions, and could not have, with reasonable investigation, uncovered the actions beforehand because of Mason's careful concealment.

64.     It wasn't until 2024, when the Tulins first learned of Mason's fraud and attempted to withdraw funds from their existing J.P. Morgan accounts, that they discovered their hard-earned money had been misappropriated and used without their knowledge or consent.

65.     It is only in hindsight, after the intervention of the FBI and further investigation, that the Tulins were able to ascertain the full extent of the fraud perpetrated by Mason and J.P. Morgan. Now, the Tulins seek to recover the funds that were wrongfully taken from them, and to

Case ID: 240801933

hold J.P. Morgan accountable for its failure to investigate, for its lack of oversight, and for its role in enabling this fraudulent scheme that has caused irreparable damage to their lives.

### COUNT I
### NEGLIGENCE
### (All Defendants)

66.     Plaintiffs incorporate the foregoing paragraphs by reference.

67.     The J.P. Morgan entities owed a duty of reasonable care to the Tulins to protect the funds held by them in their accounts at J.P. Morgan from misappropriation, prevent unauthorized transactions, and monitor the accounts for suspicious activity.

68.     J.P. Morgan knew or should have known that Mason was making unauthorized transactions from the Tulins' J.P. Morgan accounts to Mason's and Rubicon's accounts.

69.     J.P. Morgan knew or should have known that the Tulins had not authorized the renewal or any further transactions associated with the Line of Credit.

70.     The J.P. Morgan entities breached their duty of reasonable care to the Tulins by, *inter alia*,: (1) engaging in a blatant disregard for basic due diligence, allowing Mason to carry out his fraudulent activities unchecked; (2) failing to implement or follow commercially reasonable security procedures to verify the authenticity of the documents and signatures Mason submitted, despite clear red flags; (3) neglecting to require legally binding authorizations before granting Mason access to the Tulins' accounts, which would have served as a safeguard against unauthorized actions; (4) ) permitting the unauthorized renewal of the Line of Credit and the initiation of unauthorized transactions from the Line of Credit; and (5) failing to notify the Tulins of any suspicious activity related to their accounts, thereby allowing the fraudulent scheme to persist without their knowledge.

71.     As a direct and proximate result of J.P. Morgan's failure to exercise reasonable care in investigating and/or halting the fraudulent transactions involving the misappropriation of the Tulins' assets, the Tulins have suffered damages exceeding $50,000.00. These damages stem from

14

Case ID: 240801933

both the misappropriation of their funds and the significant lost investment income they would have otherwise earned from the bonds in which their funds were intended to be invested. J.P. Morgan's neglect and failure to intervene allowed the fraudulent activity to continue, depriving the Tulins of the financial returns they rightfully should have received.

WHEREFORE, Plaintiffs demand judgment in their favor in an amount in excess of $50,000.00, together with punitive damages, pre- and post-judgment interest, and such other relief as the Court deems just and proper.

## COUNT II
## BREACH OF FIDUCIARY DUTY
### (All Defendants)

72.    Plaintiffs incorporate the foregoing paragraphs by reference.

73.    As Plaintiffs' banking institutions, the J.P. Morgan entities acted as fiduciaries with respect to Plaintiffs' accounts.

74.    The J.P. Morgan entities had explicit duties to exercise reasonable standards of care in protecting the Tulins' funds, ensuring proper security protocols were followed, and monitoring for fraudulent activity. By failing to prevent unauthorized transfers from the Tulins' accounts, despite clear red flags and routine opportunities to investigate suspicious activity, J.P. Morgan breached these duties and directly enabled Mason's fraudulent actions.

75.    By accepting and maintaining Plaintiff's financial accounts, J.P. Morgan undertook fiduciary obligations to act in good faith, exercise due care, and to act in Plaintiffs' best interest.

76.    J.P. Morgan breached these fiduciary duties by:

   a.    Failing to adequately protect Plaintiffs' funds from unauthorized transfers, allowing their accounts to be exploited;

   b.    Enabling the misuse of Plaintiffs' accounts to facilitate Mason's fraudulent activities;

15

Case ID: 240801933

c.  Permitting the unauthorized renewal of the Line of Credit and the initiation of unauthorized transactions from the Line of Credit;

d.  Ignoring clear signs of fraud, such as repeated transfers to accounts controlled or managed by Mason; and

e.  Neglecting to disclose suspicious activity that, had it been properly reported, would have alerted Plaintiffs to the ongoing theft and allowed them to take corrective action.

77.  J.P. Morgan's actions and omissions amounted to a reckless disregard for Plaintiffs' financial well-being and were undertaken in breach of J.P. Morgan's fiduciary obligations to Plaintiffs.

78.  As a direct and proximate result of J.P. Morgan's breaches of fiduciary duties, the Tulins have been damaged in excess of $50,000.00 as a result of the misappropriation of their funds and the significant lost investment income they would have otherwise earned from the bonds in which their funds were intended to be invested.

WHEREFORE, Plaintiffs demand judgment in their favor in an amount in excess of $50,000.00, together with punitive damages, pre- and post-judgment interest, and such other relief as the Court deems just and proper.

## COUNT III
## FRAUD
### (All Defendants)

79.  Plaintiffs incorporate the foregoing paragraphs by reference.

80.  J.P. Morgan was at all times supposed to act in the best interest of the Tulins.

81.  Despite this, J.P. Morgan willfully made material misstatements, misrepresentations, and omissions to the Tulins in order to fraudulently transfer money from the Tulins accounts to accounts controlled by Mason.

Case ID: 240801933

82.    J.P. Morgan's fraudulent conduct was not limited to failing to stop the illegal transfers. The bank also engaged in a pattern of concealment, providing the Tulins with false or misleading information, and/or intentionally withholding material information that would have alerted them to the fraudulent activity.

83.    The misrepresentations and omissions made by J.P. Morgan were material, as they directly impacted the Tulins' ability to detect and stop the fraudulent transfers. Had J.P. Morgan provided accurate and timely information or taken reasonable steps to investigate the suspicious activity, the Tulins could have uncovered the fraud much sooner, mitigating the financial damage they sustained.

84.    As a direct and proximate result of J.P. Morgan's fraud, the Tulins have been damaged in excess of $50,000.00.

WHEREFORE, Plaintiffs demand judgment in their favor in an amount in excess of $50,000.00, together with punitive damages, pre- and post-judgment interest, and such other relief as the Court deems just and proper.

## COUNT IV
## AIDING AND ABETTING FRAUD
### (All Defendants)

85.    Plaintiffs incorporate the foregoing paragraphs by reference.

86.    J.P. Morgan, as described more particularly above, became aware of the fraudulent acts committed by Mason.

87.    J.P. Morgan knowingly continued providing substantial assistance to Mason's fraudulent scheme by processing unauthorized transfers and permitting the misuse of the Line of Credit in the Tulins' names.

88.    As a direct and proximate result of J.P. Morgan's aiding and abetting the fraudulent transaction of the Tulins' assets, the Tulins have been damaged in excess of $50,000.00.

Case ID: 240801933

WHEREFORE, Plaintiffs demand judgment in their favor in an amount in excess of $50,000.00, together with punitive damages, pre- and post-judgment interest, and such other relief as the Court deems just and proper.

## COUNT V
## VIOLATION OF 13 PA.C.S.A. § 4A204
### (All Defendants)

89.    Plaintiffs incorporate the foregoing paragraphs by reference.

90.    All J.P. Morgan entities involved are considered "banks" within the meaning of 13 Pa.C.S.A. § 4A105.

91.    All wire transactions at issue qualify as "fund transfers" under 13 Pa.C.S.A. § 4A104.

92.    As banks, the J.P Morgan entities were required to maintain commercially reasonable security procedures meant to verify the authenticity of transfer requests and detect any anomalies or fraudulent activity.

93.    Mason was not authorized to withdraw funds from the Tulins' accounts.

94.    J.P. Morgan failed to maintain commercially reasonable security procedures as required under 13 Pa.C.S.A. § 4A204, which resulted in unauthorized transfers of funds from the Tulins' accounts to accounts controlled by Mason and Rubicon.

95.    Alternatively, J.P. Morgan bypassed its established security procedures, thereby leading to unauthorized fund transfers from the Tulins' accounts.

96.    Specifically, J.P. Morgan failed to verify the authenticity of transfer requests, failed to identify and investigate suspicious transfer patterns, and neglected to implement or bypassed appropriate safeguards to detect fraudulent activity, all of which led to the misappropriation of funds from the Tulins' accounts.

Case ID: 240801933

97.     As a direct and proximate result of J.P. Morgan's failure to maintain and implement proper security procedures, the Tulins have suffered substantial damages, including the loss of their funds, totaling in excess of $50,000.00.

98.     Given J.P. Morgan's failure to uphold commercially reasonable security standards and/or the intentional bypassing of its security protocols, J.P. Morgan is legally obligated to return all unauthorized funds to the Tulins, as required under 13 Pa.C.S.A. § 4A204.

WHEREFORE, Plaintiffs demand judgment in their favor in an amount in excess of $50,000.00, together with punitive damages, pre- and post-judgment interest, and such other relief as the Court deems just and proper.

## COUNT VI
## BREACH OF CONTRACT
### (All Defendants)

99.     Plaintiffs incorporate the foregoing paragraphs by reference.

100.    At all relevant times, the Tulins and the various J.P. Morgan entities were parties to various agreements that outlined the rights, responsibilities, and fiduciary obligations of J.P. Morgan in connection with the management, security, and oversight of the Tulins' funds.

101.    Upon information and belief, the relevant agreements between the parties included, but were not limited to, the provision of account management services, account oversight, fiduciary duties to Plaintiffs, and the obligations to prevent unauthorized transactions and acts of fraud.

102.    Pursuant to these agreements, J.P. Morgan had an express and/or implied obligation to manage the Tulins' accounts in a professional, prudent, and fiduciary manner, including the duty to monitor for suspicious transactions, verify the legitimacy of documents, and prevent fraud.

103.    J.P. Morgan also had an express and/or implied obligation under these agreements to ensure that any actions taken regarding the Tulins' funds—including extending and authorizing

Case ID: 240801933

draws from the Line of Credit and executing financial transactions—were done with the proper authorization from the Tulins.

104.    Despite these contractual obligations, J.P. Morgan breached its duties under the agreements by, *inter alia*, failing to:

    a.    Conduct proper due diligence and verify whether Mason had obtained authorization from the Tulins to renew and make additional draws from the Line of Credit;

    b.    Verify the legitimacy of documents, including signatures, that Mason submitted to renew the Line of Credit;

    c.    Prevent unauthorized transactions from occurring, including the improper transfers of millions of dollars from the Tulins' accounts to accounts controlled by Mason and Rubicon, and to Mason's personal accounts, without the Tulins' knowledge or consent;

    d.    Properly monitor the Tulins' accounts for suspicious activity, allowing Mason to perpetrate his fraudulent scheme unchecked over several years; and

    e.    Alert the Tulins to the fraudulent transactions associated with the Line of Credit or take any corrective action to protect the Tulins' funds when J.P. Morgan had knowledge and/or notice of suspicious activity.

105.    J.P. Morgan's actions and inactions were in direct violation of the contractual obligations owed to the Tulins.

106.    As a direct result of J.P. Morgan's breach of contract, the Tulins suffered financial harm, including the loss of millions of dollars through unauthorized transfers and fraudulent transactions.

WHEREFORE, Plaintiffs demand judgment in their favor in an amount in excess of $50,000.00, together with punitive damages, pre- and post-judgment interest, and such other relief as the Court deems just and proper.

Case ID: 240801933

Dated:  March 12, 2025

KLEHR HARRISON HARVEY
BRANZBURG LLP

By: <u>/s/ *William A. Harvey*</u>
     William A. Harvey
     Monica Matias Quinones
     1835 Market Street | Suite 1400
     Philadelphia, Pennsylvania 19103
     Telephone:  215.569.2700
     wharvey@klehr.com
     mmatias@klehr.com
     *Attorneys for Plaintiffs*

Case ID: 240801933

## VERIFICATION

I, Stanley B. Tulin, subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities, hereby verify that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

Dated:         March         11,         2025

0
**Error! Unknown document property name.**