UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STANLEY B. TULIN and RIKI TULIN,<br><br>Plaintiffs,<br><br>-v-<br><br>J.P. MORGAN CHASE NATIONAL CORPORATE SERVICES, INC., *et al.*,<br><br>Defendants. | 25 Civ. 6773 (JPC)<br><br><u>OPINION AND ORDER</u> |

JOHN P. CRONAN, United States District Judge:

Plaintiffs Stanley B. Tulin ("Mr. Tulin") and Riki Tulin ("Mrs. Tulin"; together, the "Tulins" or "Plaintiffs") made the unfortunate decision to entrust their finances to a corrupt investment advisor named Scott Mason ("Mason"). Mason then stole from the Tulins, siphoning millions of dollars from their bank accounts and withdrawing millions more dollars for himself from a line of credit the Tulins had secured. But this suit is not against Mason. Plaintiffs bring this action against J.P. Morgan Chase National Corporate Services, Inc., J.P. Morgan Investment Management, Inc., J.P. Morgan Private Wealth Advisors LLC, JPMorgan Chase & Co., and JP Morgan Chase Bank, N.A. (together, "J.P. Morgan" or "Defendants"), which they seek to hold accountable for failing to adequately protect their accounts from Mason's malfeasance.

Defendants move to dismiss the Amended Complaint. For the reasons that follow, the Court grants the motion in part and denies it in part. The Court dismisses Plaintiffs' claims alleging fraud, aiding and abetting fraud, negligence, breach of fiduciary duty, breach of contract, and a violation of New York General Business Law Section 349. Those claims are dismissed without prejudice and with leave to amend. The Court denies the motion to dismiss as to Plaintiffs' claims

under Article 4-A of New York's Uniform Commercial Code ("UCC"), the Electronic Fund Transfer Act ("EFTA"), and the Truth in Lending Act ("TILA").

## I. Background

### A. Factual Allegations[1]

The Tulins reside primarily in Villanova, Pennsylvania. Am. Compl. ¶ 13. Mr. Tulin, formerly a financial services and insurance executive, retired about nineteen years ago. *Id.* ¶¶ 23-25. In the late 1990s, Mr. Tulin engaged Mason, who ran an investment advisory firm called Rubicon Wealth Management LLC ("Rubicon"), *id.* ¶ 34, to serve as his investment advisor. *Id.* ¶ 28. Mr. Tulin instructed Mason to pursue "an extremely conservative investment strategy" that included specifically "invest[ing] in government and/or tax-exempt bonds." *Id.* ¶ 30. In addition to his duties as Mr. Tulin's investment advisor, Mason served as Mr. Tulin's administrative assistant, "charged with paying Mr. Tulin's bills, his charitable contributions, his children's and grandchildren's schools, and related family expenses." *Id.* ¶ 31. Mason's wife, Lynne Mason, assisted with these administrative duties. *Id.*

Mason, however, secretly diverted millions of dollars from the Tulins' accounts into his own personal holdings. *Id.* ¶ 34. Between February 2007 and some point in 2024, Mason executed over $19,000,000 in unauthorized transfers from two accounts that the Tulins held with J.P. Morgan—the first account number ending in x1009 and the second ending in x9918. *Id.* ¶ 41. For example, four wire transfers totaling $150,000 were made in or around May 2013 from the Tulins' x1009 account to an account maintained by Rubicon, and those funds were then moved to

[1] The following factual allegations are taken from the Amended Complaint, Dkt. 36 ("Am. Compl."). In considering Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true the factual allegations in the Amended Complaint and draws all inferences in Plaintiffs' favor. *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015).

Rubicon's payroll and other accounts in Mason's name. *Id.* ¶ 42. Additionally, from at least December 2016 to early 2024, at least $1,823,500 in unauthorized transfers were made from the Tulins' x1009 and x9918 accounts to Orchard Park Real Estate Holdings LLC ("Orchard Park"), a limited liability company owned and controlled by Mason with no perceptible connection to the Tulins. *Id.* ¶ 43.

According to the Tulins, J.P. Morgan shoulders some of the blame. For years, J.P. Morgan allowed "obvious signs of misconduct" to continue unchecked by, for example, facilitating transfers from the Tulins' accounts to accounts controlled by Mason without documentation showing that he had valid authority to withdraw funds on the Tulins' behalf, *id.* ¶¶ 45-47; making false statements and omissions to further Mason's scheme, which misled the Tulins and prevented them from uncovering the true nature of the fraud, *id.* ¶ 49; authorizing multiple large transfers to accounts owned and controlled by Mason, with no legitimate connection to the Tulins, *id.* ¶ 51; neglecting to verify signatures on transfer requests, *id.* ¶ 52; and ignoring clear irregularities that should have raised alarms about potential fraud, *id.* Plaintiffs allege that J.P. Morgan either failed to implement commercially reasonable security procedures to prevent fraudulent transactions or neglected to follow its established security protocols. *Id.* ¶ 48.

But that is not all. In or around 2010, the Tulins secured a line of credit from J.P. Morgan, governed by a promissory note, to help their daughter purchase a home. *Id.* ¶ 55; Dkt. 36-1 ("Promissory Note"). The Tulins promptly repaid the debt associated with the line of credit. Am. Compl. ¶ 56. After paying off that debt, the Tulins assumed the line of credit account had been closed. *Id* ¶ 57. It was not. In fact, unbeknownst to the Tulins, Mason applied to extend the line of credit by submitting forged documents with their signatures to J.P. Morgan. *Id.* ¶¶ 58-59. Mason then withdrew millions of dollars from the line of credit without the Tulins' knowledge or

authorization. *Id.* ¶ 34. Upon discovering these fraudulent transactions, the Tulins "liquidate[d] significant assets to cover the substantial debt." *Id.* ¶ 64.

The Tulins maintain that J.P. Morgan failed to conduct due diligence with respect to the line of credit despite being on notice that it was renewed under "suspicious circumstances." *Id.* ¶¶ 60-61. The renewal documents contained discrepancies such as forged signatures and questionable notary certifications. *Id.* ¶ 60. Further, J.P. Morgan profited from the renewal of the line of credit because it charged interest on the amounts that Mason had withdrawn, so it was "incentiv[ized] to ignore its own policies and procedures in order to approve renewals of the credit facility." *Id.* ¶¶ 34, 62.

The Tulins discovered that they were victims of Mason's fraudulent scheme at some point in 2024 when they were contacted by the Federal Bureau of Investigation ("FBI"). *Id.* ¶ 33.

**B. Procedural History**

Soon thereafter, Mason was prosecuted in the Eastern District of Pennsylvania. *See United States v. Mason*, No. 25 Cr. 25 (TJS) (E.D. Pa.). On January 28, 2025, Mason waived indictment and pled guilty to two counts of wire fraud, 18 U.S.C. § 1343, one count of securities fraud, 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5, one count of investment advisor fraud, 15 U.S.C. §§ 80b-6, 80b-7, and five counts of filing false income tax returns, 26 U.S.C. § 7206(1). *United States v. Mason*, No. 25 Cr. 25 (TJS) (E.D. Pa.), Dkt. 3. On June 30, 2025, he was sentenced to a total term of ninety-seven months' imprisonment, followed by a three-year term of supervised release, and was ordered to pay restitution and forfeiture. *Id.*, Dkts. 25, 26.

The Tulins initiated this action in the Court of Common Pleas of Philadelphia County, Pennsylvania on August 15, 2024, by filing a praecipe for a writ of summons against J.P. Morgan Chase National Corporate Services, Inc., J.P. Morgan Investment Management, Inc., J.P. Morgan

Private Wealth Advisors LLC, and JP Morgan Chase & Co. Dkt. 1-3 (praecipe for writ of summons).[2] The Tulins then filed a complaint in Pennsylvania state court on March 12, 2025, which named the defendants in the praecipe as well as JP Morgan Chase Bank, N.A.[3] Notice of Removal ¶ 1. Defendants timely removed the action to the Eastern District of Pennsylvania on April 3, 2025. *Id*. On August 14, 2025, the Honorable Nitza I. Quiñones Alejandro of that court denied Defendants' motion to dismiss for improper venue and granted their motion to transfer venue to the Southern District of New York. Dkt. 15. The case was assigned to the undersigned the following day. Dkt. 17. On September 19, 2025, the Court granted Plaintiffs leave to file an Amended Complaint and set a briefing schedule for Defendants' anticipated motion to dismiss. Dkt. 34. Plaintiffs filed an initial version of their Amended Complaint on October 3, 2025. Dkt. 35. After that filing was found deficient, Plaintiffs refiled a corrected version of the Amended Complaint on October 6, 2025. Dkt. 36.

The Amended Complaint alleges the following nine counts: negligence ("Count I"), Am. Compl. ¶¶ 75-81, breach of fiduciary duty ("Count II"), *id.* ¶¶ 82-89, fraud ("Count III"), *id.* ¶¶ 90-95, aiding and abetting fraud ("Count IV"), *id.* ¶¶ 96-99, a violation of the UCC ("Count V"), *id.* ¶¶ 100-110, breach of contract ("Count VI"), *id.* ¶¶ 111-118, a violation of the TILA, 15 U.S.C. § 1601, *et seq.* ("Count VII"), Am. Compl. ¶¶ 119-125, a violation of the EFTA, 15 U.S.C. § 1693, *et seq.* ("Count VIII"), Am. Compl. ¶¶ 126-134, and a violation of New York General Business Law Section 349 ("Count IX"), *id.* ¶¶ 135-141. The Amended Complaint raises the four statutory claims—under the UCC, the TILA, the EFTA, and New York General Business Law—for the first

[2] In Pennsylvania, an action may be commenced by filing either (1) a praecipe for a writ of summons, *i.e.*, a request to the court for a writ of summons, or (2) a complaint. Pa. R. Civ. P. 1007.

[3] The initial pleading incorrectly named this Defendant as "J.P. Morgan Chase National Corporate." Dkt. 1 ("Notice of Removal") at 1.

time. *Compare* Am. Compl. ¶¶ 100-110, 119-141, *with* Dkt. 1-1 (complaint in the Court of Common Pleas of Philadelphia County).

Defendants moved to dismiss the Amended Complaint on November 3, 2025. Dkts. 37, 38 ("Motion"), 39 ("Cortes Decl.").[4] Plaintiffs filed their brief in opposition to dismissal on December 3, 2025. Dkt. 41 ("Opposition"). Defendants replied on December 17, 2025. Dkt. 43 ("Reply"). Both parties requested oral argument on the motion. Dkts. 40, 42.

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). For a claim to survive a motion to dismiss under Rule 12(b)(6), it must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility depends on whether "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). While a court presumes as true all facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff, *see Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237

[4] In support of their motion, Defendants filed a declaration from their attorney, with three exhibits attached: (1) a copy of the criminal information in *United States v. Mason*, No. 25 Cr. 25 (TJS) (E.D.P.A.), in the Eastern District of Pennsylvania, Cortes Decl., Exh. A; (2) excerpts of the transcript from Mason's guilty plea hearing in that case, Cortes Decl., Exh. B; and (3) a copy of the civil complaint Mr. Tulin filed against Mason, Lynne Mason, Rubicon, and Orchard Park in *Tulin v. Rubicon Wealth Management LLC*, No. 2024-19079, in the Court of Common Pleas of Montgomery County, Pennsylvania, Cortes Decl., Exh. C. "A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)). Ultimately, however, none of the exhibits attached to the Cortes Declaration factors into the Court's ruling.

(2d Cir. 2007), this presumption does not apply to "'legal conclusions' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements,'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2007) (quoting *Iqbal*, 556 U.S. at 678).

Where a claim sounds in fraud, a complaint must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Rombach v. Chang*, 355 F.3d 164, 167 (2d Cir. 2004). Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b) thus requires the complaint to plead the circumstances of the fraud and the defendant's mental state. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015). In terms of a defendant's mental state, the complaint must allege facts "that give rise to a strong inference of fraudulent intent." *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)). Courts view the alleged facts "in their totality, not in isolation." *Id.* (citation omitted). "[W]here a plaintiff's claims do not sound in fraud," however, "the plaintiff need not meet 'the heightened pleading standard of Rule 9(b).'" *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 595 (S.D.N.Y. 2022) (quoting *Rombach*, 355 F.3d at 171).

Because Rule 9(b) applies to claims that "are premised on allegations of fraud," and that determination is "cast in terms of the conduct alleged," it is "not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach*, 355 F.3d at 171; *see Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008) (observing that Rule 9(b) applies to a "cause of action that bears a close legal relationship to fraud"); *Frota v. Prudential-Bache Secs., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty—statutory, common law, tort, contractual, or fiduciary."). Defendants take the position

that Rule 9(b)'s heightened pleading standard applies to all of Plaintiffs' claims because they "are expressly premised on averments of fraud." Motion at 6. While Plaintiffs agree that Rule 9(b) applies to their fraud and aiding-and-abetting-fraud claims in Counts III and IV, Opposition at 5 n.2, they dispute whether Rule 9(b) applies to their remaining claims. In Plaintiffs' view, the Amended Complaint "alleges not only intentional conduct, but negligence and breaches of duty," rendering Rule 9(b)'s pleading standard inapplicable to those claims. *Id.* The Court considers below whether each claim is subject to Rule 9(b)'s standard.

## III. Discussion[5]

### A. Common Law Claims Subject to Rule 9(b)

The Court begins with Plaintiffs' claims of fraud in Count III and aiding and abetting fraud in Count IV. As noted, the parties agree that these claims are subject to Rule 9(b)'s heightened pleading standard. Motion at 6; Opposition at 5 n.2.

#### 1. Fraud (Count III)

In Count III, Plaintiffs allege that J.P. Morgan engaged in fraud by "willfully ma[king] material misstatements, misrepresentations, and omissions to the Tulins in order to fraudulently transfer money from the Tulins['] accounts to accounts controlled by Mason." Am. Compl. ¶ 92. The Court begins with Plaintiffs' allegation of fraudulent misstatements and misrepresentations, before turning to their allegation of fraudulent omissions.

[5] The parties apply New York law in their briefs. *See, e.g.*, Motion at 11, 16-18; Opposition at 16, 23; Reply at 8, 10 n.4. Therefore, the Court applies New York law in resolving the motion. *See Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (internal quotation marks and alteration omitted)). Further, the choice-of-law provision in the Promissory Note governing the Tulins' line of credit designates New York law. Promissory Note at 7.

"To state a claim for fraudulent misrepresentation under New York law a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004) (citation modified). Under Rule 9(b)'s pleading standard, this means that a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170.

Defendants contend that Plaintiffs' allegations of fraudulent misrepresentations fail to meet these requirements. Motion at 6-10. Plaintiffs respond that Defendants held "themselves out as respectable Wall Street banking institutions that could be trusted with large sums of money," Opposition at 5, and point to particular statements allegedly made by J.P. Morgan publicly:

> J.P. Morgan's website touts its "priority" to be "protecting [clients] assets and information." J.P. Morgan represented that it invested in "advanced technology and . . . multiple defense layers for [clients'] safety." It claimed to provide "24/7 fraud monitoring and prevention" that enabled it to "implement prevention solutions as we identify trends." J.P. Morgan also claimed to have "dedicated teams standing by to help with recovery of funds and other remediation needs in the event [clients] have a cyber or fraud incident."

Am. Compl. ¶ 38; *see* Opposition at 5.

These allegations—which amount to broad statements touting J.P. Morgan's ability and commitment to protect its clients from fraud—fall well short of satisfying Rule 9(b). A financial institution's general promotion of its fraud-detection capabilities and commitment does not amount to a fraudulent misstatement if a customer nonetheless finds himself a victim of a bad actor's fraud. *Cf. New York by James v. Citibank, N.A.*, 763 F. Supp. 3d 496, 538 (S.D.N.Y. 2025) ("No reasonable consumer would expect that a financial institution's general averments to prioritize

security connoted a promise to use any particular security protocol or that a customer's account was impenetrable to fraud."), *appeal pending,* No. 25-1179 (2d Cir. Sept. 3, 2025); *id.* at 506, 537 (explaining that a bank defendant advertising that "security 'is a priority . . . with 24/7 fraud detection services and security features to keep your account information protected'" constituted puffery, which is "by [its] nature not fraudulent or deceptive"). Nor do these generalized allegations meet the level of particularity required under Rule 9(b). *See, e.g.*, *Valentini v. Grp. Health Inc.*, No. 20 Civ. 9526 (JPC), 2021 WL 6113991, at *4-5 (S.D.N.Y. Dec. 27, 2021) (finding that the plaintiffs failed to plead their fraud claim against corporate defendants with requisite particularity under Rule 9(b) where they alleged that vague advertising statements from unnamed speakers at unknown times and general information on their website constituted fraudulent misrepresentation); *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (affirming dismissal of a complaint because "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants'").

In arguing otherwise, Plaintiffs rely on two cases: *In re Grupo Televisa Securities Litigation*, 368 F. Supp. 3d 711 (S.D.N.Y. 2019), and *Gimpel v. The Hain Celestial Group, Inc.*, 156 F.4th 121 (2d Cir. 2025). Opposition at 5-6. Neither helps Plaintiffs.

In *In re Grupo Televisa Securities Litigation*, the Honorable Louis L. Stanton of this District found that a company's misstatements "in its certifications concerning the design and efficacy of internal controls [were] actionable." 368 F. Supp. 3d at 720-21. The complaint there made particularized allegations concerning the alleged fraud and asserted that "the internal control deficiencies could only have resulted from deliberate design, and not from oversight, incompetence, or mistake." *Id.* That is very different from J.P. Morgan generally touting its technology capacities on the company website. At most, Plaintiffs' allegations amount to vague

accusations that J.P. Morgan failed to achieve "its 'priority'" of "'protecting [clients] assets and information.'" Am. Compl. ¶ 38.

*Gimpel* is inapposite as well. Plaintiffs cite *Gimpel* in support of their argument that Defendants had a duty to correct their false representations to Plaintiffs. Opposition at 6. The plaintiff in *Gimpel* alleged that the defendant company had manipulated sales numbers by "entic[ing] [its] distributors to take on additional inventory by offering various concessions" to bridge its estimated sales shortfalls each quarter, effectively "pulling forward" its sales in order to "report to investors that it had met its performance benchmarks without disclosing its declining financial prospects." 156 F.4th at 130. That too is a far cry from the allegations here. Plaintiffs' general allegations about J.P. Morgan's alleged representations of its fraud prevention abilities and commitment to that end do not amount to particularized allegations of fraud, let alone misrepresentations that required correction.

Nor have Plaintiffs sufficiently alleged that Defendants made fraudulent omissions. To adequately plead fraudulent omissions, a complaint must allege: "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000). Plaintiffs argue that the relevant omissions arose from Defendants' alleged "duty to monitor Plaintiffs' accounts for fraudulent or unauthorized transactions" and statements holding "themselves out as having sophisticated monitoring systems that would detect and prevent fraud," which allegedly turned out to be untrue. Opposition at 7. But this theory of fraudulent omissions mirrors Plaintiffs' theory of fraudulent misrepresentations—*i.e.*, Defendants had a duty to monitor

Plaintiffs' accounts to prevent Mason's fraud, yet failed to do so. Thus, Plaintiffs' claim of fraudulent omission fails for the same reason as their claim for fraudulent misrepresentation.

**2. Aiding and Abetting Fraud (Count IV)**

In Count IV, Plaintiffs allege that J.P. Morgan aided and abetted Mason's fraud "by processing unauthorized transfers and permitting the misuse of the Line of Credit in the Tulins' names." Am. Compl. ¶ 98. "To establish liability for aiding and abetting fraud under New York law, a plaintiff must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission."[6] *Lerner*, 459 F.3d at 292 (cleaned up). "To satisfy the knowledge prong, a plaintiff must demonstrate that the defendant had actual knowledge of the underlying fraud." *Pennington v. D'Ippolito*, 855 F. App'x 779, 783 (2d Cir. 2021) (citing *Oster*, 905 N.Y.S.2d at 72); *accord Lerner*, 459 F.3d at 292. "Constructive knowledge does not suffice." *Pennington*, 855 F. App'x at 783. Count IV fails because Plaintiffs fail to plead with particularity Defendants' actual knowledge of Mason's fraud.

[6] Plaintiffs articulate the knowledge requirement of a claim for aiding and abetting fraud a little differently. In setting forth the standard for the claim, Plaintiffs cite *Vaughn v. Consumer Home Mortgage, Inc.*, No. 01 Civ. 7937 (ILG), 2003 WL 21241669 (E.D.N.Y. Mar. 23, 2003), which required that "the defendant knew *or should have known* of the fraud," *id.* at *6 (emphasis added). *See* Opposition at 9. The case on which *Vaughn* relied for this proposition is *Ifill v. West*, No. 96 Civ. 6308 (SJ), 1999 WL 690144, at *12 (E.D.N.Y. Aug. 24, 1999). *Ifill*, in turn, cited various cases from this District that did not reveal any source in New York law, as well as one case from the New York Supreme Court's Appellate Division, First Department, *National Westminster Bank USA v. Weksel*, 511 N.Y.S.2d 626, 630 (1st Dep't 1987). But in a more recent decision, *Oster v. Kirschner*, 905 N.Y.S.2d 69 (1st Dep't 2010), the First Department stated that "[a] plaintiff alleging an aiding-and-abetting fraud claim must allege the existence of the underlying fraud, *actual knowledge*, and substantial assistance." *Id.* at 72 (emphasis added). Therefore, to the extent that prior authorities suggested that constructive knowledge could satisfy the knowledge requirement for aiding and abetting fraud, that proposition does not appear to currently find support in New York law.

In arguing that they have pleaded actual knowledge, Plaintiffs point to the following allegation from the Amended Complaint: "Upon information and belief, during the commission of Mason's fraudulent acts, J.P. Morgan became aware of those acts. Despite this, J.P. Morgan continued assisting and facilitating the commission of Mason's fraud." Am. Compl. ¶ 71; *see* Opposition at 9-10. Relatedly, Plaintiffs also allege, "At various points, the bank was made aware, either through red flags or other means, that Mason was engaging in unauthorized and suspicious transactions, such as transferring money to accounts owned or controlled by Mason." Am. Compl. ¶ 54. Plaintiffs argue that these allegations suffice because "actual knowledge need only be pleaded generally, . . . particularly at the prediscovery stage," because "a plaintiff lacks access to the very discovery materials which would illuminate a defendant's state of mind." Opposition at 9.

While it is true that actual knowledge can be pleaded "generally," actual knowledge still must be "discern[ible] from the surrounding circumstances." *Oster*, 905 N.Y.S.2d at 72. Conclusory allegations alone are insufficient. *See Lerner*, 459 F.3d at 292-93 (holding that "plaintiffs' conclusor[y] alleg[ations]" of actual knowledge fail to meet Rule 9(b)'s particularity requirement). For instance, merely alleging that a bank "had knowledge of [a fraudster's] [d]eception the entire time" is too conclusory to satisfy the knowledge requirement for aiding and abetting fraud. *Bocci v. Nationstar Mortg. LLC*, No. 23 Civ. 1780 (JPC) (KHP), 2025 WL 2754479, at *15 (S.D.N.Y. 2025). Plaintiffs' allegations of actual knowledge in this case are just as conclusory. Plaintiffs baldly assert that J.P. Morgan "became aware" or "was made aware" of Mason's fraudulent conduct, without pleading any specific facts related to that supposed awareness. Am. Compl. ¶¶ 54, 71. Further, that bald assertion of J.P. Morgan's knowledge comes in direct conflict with Plaintiffs' allegations elsewhere in the Amended Complaint criticizing J.P.

Morgan for not doing enough to discover the fraud. *See* Am. Compl. ¶ 67 ("Had J.P. Morgan conducted the most basic of inquiries, it *would have* learned that the documents submitted by Mason were fraudulent and contained forged signatures. Further, J.P. Morgan *would have discovered* that the Tulins did not authorize the transactions at issue." (emphases added)).

Thus, because Plaintiffs fail to adequately plead J.P. Morgan's actual knowledge of Mason's fraudulent scheme, they have not stated a claim for aiding and abetting it. The Court therefore dismisses Count IV.

**B. Common Law Claims Not Subject to Rule 9(b)**

The Court next turns to Plaintiffs' three other common law claims: breach of contract, negligence, and breach of fiduciary duty. Before turning to their merits, the Court addresses the appropriate pleading standard to apply. Each of these claims relies on various alleged failures on the part of J.P. Morgan for not exercising sufficient vigilance to detect and thwart Mason's scheme; they are not, however, "premised on allegations of fraud," *Rombach*, 355 F.3d at 171. *See* Am. Compl. ¶ 116 (premising the breach-of-contract claim on allegations that J.P. Morgan had failed to, *inter alia*, "[c]onduct proper due diligence," "[v]erify the legitimacy of documents," and "[p]roperly monitor the Tulins' accounts for suspicious activity"); *id.* ¶ 80 (premising the negligence claim on allegations that J.P. Morgan had, *inter alia*, "disregard[ed] . . . due diligence," "fail[ed] to implement or follow commercially reasonable security procedures," and "neglect[ed] to require legally binding authorizations" for granting access to the Tulins' accounts); *id.* ¶ 87 (premising the claim for breach of fiduciary duty on allegations that J.P. Morgan "[f]ail[ed] to adequately protect Plaintiffs' funds," "[i]gnor[ed] . . . signs of fraud," and "[n]eglect[ed] to disclose suspicious activity"). These allegations of insufficient vigilance do not give rise to a strong inference of fraudulent intent and do not sound in fraud. *See, e.g.*, *In re Suprema*

*Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 273 (2d Cir. 2006) ("[W]here [a] plaintiff has exercised care in differentiating asserted negligence claims from fraud claims and in delineating the allegations that support the negligence cause of action as distinct from the fraud, the determination [of whether to apply Rule 9(b)] is straightforward."). Rule 9(b)'s heightened pleading standard therefore does not apply to these three claims.

**1. Breach of Contract (Count VI)**

In Count VI, Plaintiffs allege that Defendants were parties to "various" agreements which "included, but were not limited to, the provision of account management services, account oversight, fiduciary duties to Plaintiffs, and the obligations to prevent unauthorized transactions and acts of fraud." Am. Compl. ¶¶ 112-113. Defendants breached their duties under those agreements, Plaintiffs contend, by conducting inadequate due diligence, failing to verify the documents that Mason submitted to renew Plaintiffs' line of credit, failing to prevent unauthorized transactions, and failing to monitor Plaintiffs' accounts or notify them of suspicious activity. *Id.* ¶ 116.

"Under New York law, there are four elements to a breach of contract claim: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). "To plead these elements, 'a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue.'" *Id.* at 189. "Moreover, 'stating in a conclusory manner that an agreement was breached does not sustain a claim of breach of contract.'" *Id.*

Plaintiffs' breach-of-contract claim fails out of the gate because they do not identify any specific contractual provision that Defendants allegedly breached. Plaintiffs point only to the provision at Paragraph 11(f) of the Promissory Note governing the line of credit which states: "Unless otherwise agreed in writing, notices shall be given to the Bank and the Borrower at the telecopier numbers . . . or addresses set forth in the signature page of this Note, or such other telecopier (and telephone) number or address communicated in writing by either such party to the other," Promissory Note ¶ 11(f). Opposition at 17. Plaintiffs argue that Defendants breached this contractual duty when their line of credit was renewed without notice to them. *Id.* But Paragraph 11(f) does not identify any *particular* notice that was contractually required to be delivered yet was not. Nor does this provision prescribe *when* notice must be given, such as upon the renewal of a line of credit. Rather, the provision specifies only the *manner* in which notice must be given—at a specific number or address. Plaintiffs thus have not stated a breach-of-contract claim on the basis of the Promissory Note.

Plaintiffs also gesture to the existence of "various" other agreements that set forth Defendants' duties, but the Amended Complaint identifies neither those contracts nor the provisions in them that were allegedly breached. *See* Am. Compl. ¶¶ 112-116. In the absence of more specific factual allegations regarding any of these agreements, Plaintiffs fail to state a claim that they were breached.[7]

---

[7] In opposing dismissal, Plaintiffs raise for the first time a claim for breach of the covenant of good faith and fair dealing. Opposition at 17-18. This Court declines to consider a claim first asserted in an opposition brief and not alleged in the pleading. *See, e.g.*, *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (declining to consider an argument based on an alleged duty that "does not appear anywhere in the amended complaint and did not enter the case until [the plaintiff] mentioned it for the first time in her opposition memoranda to the motion to dismiss"); *Saray Dokum ve Madeni Aksam Sanayi Turizm A.S. v. MTS Logistics, Inc.*, No. 17 Civ. 7495 (JPC), 2021 WL 1199470, at *7 (S.D.N.Y. Mar. 30, 2021) (collecting cases).

**2. Negligence (Count I)**

In their negligence claim in Count I, Plaintiffs allege that J.P. Morgan failed to exercise "reasonable care" by conducting inadequate due diligence, implementing inadequate security procedures, failing to require Plaintiffs' authorization before granting Mason access to their accounts, permitting the unauthorized renewal of Plaintiffs' line of credit and subsequent transactions, and failing to notify them of suspicious activity. Am. Compl. ¶ 80.

To state a negligence claim under New York law, "a plaintiff must allege (1) that the defendant owed him or her a cognizable duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damage as a proximate result of that breach." *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 280 (S.D.N.Y. 2014) (internal quotation marks omitted). "The threshold question in any negligence action is: does defendant owe a legally recognized duty of care to plaintiff?" *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1060 (N.Y. 2001). Plaintiffs contend that Defendants breached the duty of reasonable care to protect Plaintiffs' funds from misappropriation, prevent unauthorized transactions, and monitor the accounts for suspicious activity. Am. Compl. ¶ 76. In seeking dismissal of Count I, Defendants argue that banks owe no "duty to monitor and report purported account malfeasance," Motion at 13, and, alternatively, that any duty here arose solely from a contractual agreement and is therefore duplicative of Plaintiffs' breach-of-contract claim in Count VI, *id.* at 17-18.

To be sure, courts in this Circuit have recognized "that a bank has a duty to exercise reasonable skill and care in carrying out its activities for its customers." *Torcik v. Chase Manhattan Bank*, No. 02 Civ. 5994 (FB), 2005 WL 2155138, at *4 (E.D.N.Y. Sept. 7, 2005) (internal quotation marks omitted) (collecting cases), *aff'd*, 208 F. App'x 24 (2d Cir. 2006); *accord King v. Crossland Sav. Bank*, 111 F.3d 251, 259 (2d Cir. 1997) (noting that the district court

acknowledged that "banks do, in fact, owe a duty of care to their customers"). But the precise duty Defendants allegedly breached is governed entirely by contract.

Particularly persuasive is *Essilor International SAS v. J.P. Morgan Chase Bank, N.A.*, 650 F. Supp. 3d 62 (S.D.N.Y. 2023), where the Honorable Lewis J. Liman rejected a claim that a bank defendant had an extracontractual "duty to monitor and report on overdrafts," *id.* at 87. Drawing on a line of cases where the Second Circuit has rejected the notion that a bank has a duty to monitor fiduciary accounts and trust accounts for fiduciary misappropriation, the court found that banks have "no extracontractual duty to report and prevent overdraft activity on behalf of [customers]." *Id.*; *cf. Lerner*, 459 F.3d at 287 ("As a general matter, 'a depositary bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation.'"). That analysis makes sense. A fiduciary account is managed by a fiduciary on another person's behalf, *see Lerner*, 459 F.3d at 279 (citing N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.46(b)(1)), and if banks have no duty to monitor those accounts—which by definition are accessible by a third party who is not the owner of the funds—then it follows that banks have no extracontractual duty to monitor ordinary deposit accounts which are not necessarily accessible by a third party. *Cf. Essilor Int'l*, 650 F. Supp. 3d at 88 ("If banks have no duty to monitor the fiduciary and fiduciaries and trustees for whose benefit they are opened, then logically there should be no extracontractual duty to report and prevent overdraft activity on behalf of Plaintiffs. To the degree that JP Morgan was required to do so, that duty must be found in contract, not tort.").

The duty that Defendants allegedly owed Plaintiffs—to protect their funds from misappropriation, prevent unauthorized transactions, and monitor their accounts—is virtually identical to the duty rejected in *Essilor International*. Similar to the plaintiffs in *Essilor*

*International*, Plaintiffs here fail to allege a cognizable duty of care to support an extracontractual negligence claim.[8] Because Plaintiffs' negligence claim does not arise from a legal duty independent of the contractual relationship between Plaintiffs and J.P. Morgan, the claim is duplicative of Plaintiffs' breach-of-contract claim. *See Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012) ("[A] breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated."); *Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 670 (S.D.N.Y. 2008) ("[C]ourts have found that in actions involving the contractual duties of corporations and financial institutions, a negligence action may not be maintained and parties must proceed under a contract theory.").[9]

---

[8] Citing the Second Circuit decision in *Lerner*, Judge Liman recognized in *Essilor International* that a bank may nevertheless "be liable for participation in [such a] diversion, either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed." 650 F. Supp. 3d at 88 n.14 (quoting *Lerner*, 459 F.3d at 287 (quoting *In re Knox*, 477 N.E.2d 448, 451 (N.Y. 1985))). But the context of *In re Knox* makes clear that that holding was cabined to fiduciary accounts:

> In general, a bank may assume that a person acting as a fiduciary will apply entrusted funds to the proper purposes and will adhere to the conditions of the appointment. A bank is not in the normal course required to conduct an investigation to protect funds from possible misappropriation by a fiduciary, unless there are facts . . . indicating misappropriation. In this event, a bank may be liable for participation in the diversion, either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed.

477 N.E.2d at 451 (internal citations omitted). Further, in *In re Knox*, the New York Court of Appeals rejected a finding of liability for the bank where a fiduciary cashed a check, made out to him in his fiduciary capacity, to his personal account instead. *Id.* at 449. This case does not involve fiduciary accounts, and the Court declines to extend *In re Knox* in this manner, particularly given the absence of allegations establishing J.P. Morgan's knowledge of Mason's fraudulent misappropriation of Plaintiffs' funds, *see supra* III.A.2.

[9] In opposing dismissal, Plaintiffs also argue that their negligence claim is not duplicative because "Defendants maintained ineffective controls against fraud or failed to implement their own controls" "[d]espite publicly touting [their] commitment to safety, protecting client assets, and staving off fraud." Opposition at 15. This appears to describe a claim of negligent misrepresentation, but no such claim was pleaded in the Amended Complaint. *See* Am. Compl. ¶¶ 75-81. This Court declines to consider a new claim alleged in Plaintiffs' opposition brief to the

Plaintiffs thus fail to state a negligence claim.[10]

**3. Breach of Fiduciary Duty (Count II)**

In alleging breach of fiduciary duty, Plaintiffs identify the relevant duty as entailing "exercis[ing] reasonable standards of care in protecting the Tulins' funds, ensuring proper security protocols were followed, and monitoring for fraudulent activity." Am. Compl. ¶ 85. Plaintiffs contend that they had a "special relationship" with Defendants because they "reposed their trust and confidence in J.P. Morgan, . . . relied upon J.P. Morgan for its specialized expertise," and "relied upon J.P. Morgan to execute [their] investment strategy, relying upon J.P. Morgan's self-proclaimed knowledge and experience." *Id.* ¶ 84. According to Plaintiffs, Defendants breached that fiduciary duty by failing to adequately protect their funds from unauthorized transfers, enabling the misuse of their accounts, permitting the unauthorized renewal of their line of credit, ignoring signs of fraud, and failing to notify them of suspicious activity on their accounts. *Id.* ¶ 87.

Defendants maintain that their relationship with Plaintiffs was simply "the relationship between a bank and its depositor . . . , which, without more, is not a fiduciary or special relationship." Motion at 15 (quoting *JPMorgan Chase Bank, N.A. v. Freyberg*, 171 F. Supp. 3d 178, 191 (S.D.N.Y. 2016)). Plaintiffs acknowledge that a bank does not ordinarily owe a fiduciary duty to its depositor, but insist it does where, as here, it has "superior knowledge and [a] position of trust." Opposition at 15 (quoting *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 477 (S.D.N.Y. 2010), *aff'd sub nom. Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73 (2d Cir. 2011)).

---

motion to dismiss. *See, e.g.*, *Wright*, 152 F.3d at 178; *Saray Dokum ve Madeni Aksam Sanayi Turizm A.S.*, 2021 WL 1199470, at *7.

[10] Because the Court finds Plaintiffs' negligence claim to be duplicative of its breach-of-contract claim, the Court need not reach Defendants' alternative arguments that the negligence claim is barred by the economic loss doctrine and that it is premised only on intentional misconduct. *See* Motion at 14-15.

According to Plaintiffs, Defendants occupied such a position of trust because Plaintiffs "entrusted" Defendants with their funds and relied on Defendants' "knowledge and experience" to execute their investment strategy. *Id.* at 15.

The Court agrees with Defendants that merely depositing one's savings into bank accounts, as Plaintiffs did, does not create a "special relationship" or fiduciary duty. Plaintiffs' reliance on *In re Parmalat Securities Litigation* is misplaced because the special relationship there was between the bank and investment-vehicle companies created and totally controlled by the banks. 684 F. Supp. 2d at 458, 476 (describing the process by which Bank of America "arranged for the creation of two special purpose entities," over which Bank of America "exercised absolute or virtually absolute control even after their boards were appointed"). Plaintiffs allege no facts giving rise to a comparable special relationship between them and J.P. Morgan, or even facts suggesting a relationship that extended beyond that of a bank and its depositor.

Nor does the Promissory Note governing the line of credit convert J.P. Morgan into Plaintiffs' fiduciary. Plaintiffs allege that the line of credit gives rise to a fiduciary duty because the Promissory Note "cover[s] the rights, responsibilities, and fiduciary obligations of J.P. Morgan in connection with the management of the Tulins' accounts." Am. Compl. ¶ 40. In other words, Plaintiffs contend that the fiduciary duty arose from a contract they had with J.P. Morgan. But as mentioned, "a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated." *Bayerische Landesbank, N.Y. Branch*, 692 F.3d at 58.

Plaintiffs thus fail to state a claim for breach of fiduciary duty and Count II is dismissed.

## C. Statutory Claims

### 1. Violation of UCC Article 4-A (Count V)

Turning to Count V, Plaintiffs allege that Defendants violated Sections 4-A-202 and 4-A-204 of the UCC with respect to Mason's unauthorized wire transfers by "fail[ing] to maintain commercially reasonable security procedures" or, alternatively, by "bypass[ing] [their] established security procedures." Am. Compl. ¶¶ 105, 106. Plaintiffs specifically contend that Defendants "failed to verify the authenticity of transfer requests, failed to identify and investigate suspicious transfer patterns, and neglected to implement or bypassed appropriate safeguards to detect fraudulent activity," and that Defendants did not "accept the payment order(s) [placed by Mason] in good faith." *Id.* ¶¶ 107, 108.

"Article 4-A of the UCC governs the procedures, rights, and liabilities arising out of commercial electronic funds transfers." *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir. 1998). Plaintiffs premise their UCC claim on wire transfers initiated by Mason, which are electronic funds transfers governed by Article 4-A. *See Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 88 (2d Cir. 2010); *Beck v. Metro. Bank Holding Corp.*, 747 F. Supp. 3d 442, 453 (E.D.N.Y. 2024). Under Article 4-A, a "receiving bank"—here, J.P. Morgan—must refund its customer—here, Plaintiffs—if it "accepts a payment order issued in the name of its customer as sender which is (a) not authorized and not effective as the order of the customer under Section 4-A-202, or (b) not enforceable, in whole or in part against the customer under Section 4-A-203." UCC § 4-A-204(1); *accord 2006 Frank Calandra, Jr. Irrevocable Tr. v. Signature Bank Corp.*, 816 F. Supp. 2d 222, 233 (S.D.N.Y. 2011) (citing UCC § 4-A-204), *aff'd*, 503 F. App'x 51 (2d Cir. 2012). Article 4-A defines "payment order" as "an instruction of a sender to a receiving bank, transmitted orally or in a record, to pay, or to cause another bank to pay, a fixed

or determinable amount of money to a beneficiary." UCC § 4-A-103(1)(a). As relevant here, a payment order is "effective" "if (a) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (b) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure." *Id.* § 4-A-202(2).

Defendants present two arguments for why Plaintiffs' UCC claim should be dismissed. First, Defendants argue that Plaintiffs fail to allege with particularity how their procedures were deficient, an argument that assumes Rule 9(b)'s heightened pleading standard applies to this claim. Motion at 6, 22; Reply at 10. But allegations that Defendants failed to maintain commercially reasonable security procedures or practices to prevent Mason from carrying out *his* fraudulent scheme does not itself "give rise to a strong inference of fraudulent intent" on J.P. Morgan's part. *Loreley Fin. (Jersey) No. 3*, 797 F.3d at 171 (quoting *Lerner*, 459 F.3d at 290-91). Similar to the non-fraud common law claims, Plaintiff's UCC claim more closely resembles one faulting J.P. Morgan for its carelessness or negligence rather than one premised on allegations of fraud. *See Rombach*, 355 F.3d at 171. Rule 9(b) therefore does not apply to this claim. *See Garnett*, 632 F. Supp. 3d at 595 ("[W]here a plaintiff's claims do not sound in fraud, the plaintiff need not meet 'the heightened pleading standard of Rule 9(b).'"). Rather, to survive dismissal, the allegations supporting Count V must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plaintiffs' UCC claim meets this standard. *See, e.g.*, Am. Compl. ¶¶ 48, 56, 107 (alleging that Defendants "failed to implement commercially reasonable security procedures to prevent fraudulent transactions or neglected to follow its established security protocols," "failed to verify the authenticity of the documents and signatures Mason submitted," "neglect[ed] to require legally binding authorization before granting Mason access to the Tulins' accounts," "failed to identify

and investigate suspicious transfer patterns, and neglected to implement or bypassed appropriate safeguards to detect fraudulent activity").

Defendants also briefly argue that Plaintiffs' allegations "fall within the EFTA's ambit," so their UCC claim must be dismissed. Motion at 22. In support of this argument, Defendants rely on *Bernstein v. JPMorgan Chase Bank, N.A.*, 775 F. Supp. 3d 701 (S.D.N.Y. 2025), where the Honorable Jessica G. L. Clarke determined that the EFTA, not Article 4A of the UCC, applied to alleged unauthorized payments. *See* Motion at 22. But Judge Clarke reached this holding because the unauthorized transfers were "automated clearing house ('ACH') payments," which the EFTA expressly regulates. *Bernstein*, 775 F. Supp. 3d at 716. That is not the case here. Plaintiffs do not allege that the unauthorized transfers in this case were conducted through ACH, and Defendants do not argue that they were.

Nevertheless, Defendants are correct that Article 4-A does not apply to a funds transfer that is governed by the EFTA. UCC § 4-A-108 ("[T]his Article does not apply to a funds transfer any part of which is governed by the Electronic Fund Transfer Act[.]"). So that prompts the question: Do Plaintiffs' UCC allegations fall outside the EFTA's scope? The EFTA governs "electronic fund transfers," which it defines as "any transfer of funds . . . which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes . . . withdrawals of funds." 15 U.S.C. § 1693a(7). The term "electronic fund transfer," however, excludes "any transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer *by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer*." *Id.* § 1693a(7)(B) (emphasis added). This

prompts a further question: Were the alleged unauthorized wire transfers made through a service that transfers funds held at either Federal Reserve banks or other depository institutions and which service is not designed primarily to transfer funds for consumers? Courts have split on this question. *Compare Fischer & Mandell LLP v. Citibank, N.A.*, No. 09 Civ. 1160 (RJS), 2009 WL 1767621, at *4 (S.D.N.Y. June 22, 2009) (finding that "'wire or other similar transfers are explicitly excluded from the EFTA's definition of 'electronic fund transfer'" and therefore from the statute's purview), *with New York by James v. Citibank, N.A.*, 763 F. Supp. 3d 496, 514 (S.D.N.Y. 2025) (determining that Section 1693a(7)(B)'s carveout "does not apply to electronic transfers of funds between consumers and their financial institutions, even when made ancillary to an interbank wire," meaning wire transfers between consumer accounts are within the EFTA's purview), *appeal pending,* No. 25-1179 (2d Cir. Sept. 3, 2025).

But the Court need not resolve that question. Defendants make no argument for why the wire transfers at issue should be adjudicated under the EFTA and thus fall outside the UCC. And based on Plaintiffs' allegations, there is no basis to conclude that the wire transfers in fact do not fall under the EFTA's exclusion. *See, e.g.*, Am. Compl. ¶ 42 ("[O]n or around May 2013, Mason made four wire transfers totaling $150,000 from the Tulins' J.P. Morgan account x1009 to Bancorp x3680, an account maintained by Rubicon."); *id.* ¶ 43 (highlighting in a table $1,632,500 in unauthorized wire transfers from accounts x1009 and x9918). Thus, the Court finds that, at this stage, Plaintiffs have plausibly stated a claim under Article 4-A of the UCC pertaining to the alleged unauthorized wire transfers.

**2. Violation of the EFTA (Count VIII)**

Plaintiffs allege in Count VII that Defendants violated the EFTA by failing to alert them "to numerous and extensive fraudulent and suspicious transaction[s] over a period of years," and

by "turn[ing] a blind eye to red flags of fraud in both the pattern of transactions and the documentation supported in connection with those transactions." Am. Compl. ¶ 132. Because failing to provide alerts and "turn[ing] a blind eye" are allegations that do not sound in fraud, Rule 9(b)'s heightened pleading standard does not apply to this claim. *See Rombach*, 355 F.3d at 171.

The EFTA "provide[s] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b). A plaintiff is required to bring an EFTA action "within one year from the date of the occurrence of the violation." *Id.* § 1693m(g). Plaintiffs allege that Mason, with Defendants' assistance, "made over $19,000,000 in authorized transfers" "[f]rom at least on or about February 2007 through the end of 2024." Am. Compl. ¶¶ 41, 43. Plaintiffs initiated this lawsuit with a praecipe in the Court of Common Pleas of Philadelphia County on August 15, 2024, Dkt. 1-3, and then filed their original complaint on March 12, 2025, but that original complaint did not plead an EFTA claim, Dkt. 1-1. Plaintiffs asserted an EFTA claim for the first time in the Amended Complaint they filed with this Court on October 3, 2025. Am. Compl. ¶¶ 126-134.[11]

Defendants argue that Plaintiffs' EFTA claim is untimely because "Plaintiffs should have been—and surely were—on notice" more than a year before they raised it. Motion at 18. Plaintiffs respond that their initiation of the case in state court tolled the statute of limitations. Opposition at 19 n.11 (citing *Roseberry v. City of Philadelphia*, No. 14-2814, 2016 WL 826825, at *7 (E.D. Pa. Mar. 3, 2016)). Further, they argue that their EFTA claim "relates back to the date of the

[11] Certain dates in Defendants' motion appear to be slightly inaccurate. Defendants contend that Plaintiffs filed their suit in Philadelphia County on August 16, 2024, Motion at 18, although the praecipe indicates that it was filed on August 15, 2024, Dkt. 1-3. Defendants also contend that Plaintiffs asserted their EFTA and TILA claims for the first time on September 30, 2025, Motion at 18, but the Amended Complaint alleging those claims was filed on October 3, 2025, Dkt. 35, with a corrected version filed on October 6, 2025, Dkt. 36.

original pleading," referring to the original complaint of March 12, 2025, because it "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." *Id.* at 20 n.11 (citing Fed. R. Civ. P. 15(c)(1)(B)).

Beginning with the relation-back argument, Federal Rule of Civil Procedure 15(c)(1)(B) provides: "An amendment to a pleading relates back to the date of the original pleading when: . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). This rule "governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010). Plaintiffs' EFTA claim in the Amended Complaint relates back to their original pleading—which at the latest would be the complaint they filed in Philadelphia County court on March 12, 2025[12]—because the claim arises from the same conduct as in that original complaint. *Compare* Dkt. 1-1 ¶¶ 16-65, *with* Am. Compl. ¶¶ 22-74.

But the question remains whether more than a year passed between the alleged EFTA violations and Plaintiffs' filing of the original complaint in Philadelphia County court. When a series of unauthorized withdrawals occur from a customer's bank account, each withdrawal is treated as a separate "occurrence" under the EFTA. *Kaiser v. USAA Life Ins. Co.*, 818 F. Supp. 3d 607, 617 (S.D.N.Y. 2026). Thus, each unauthorized transfer by Mason would be subject to EFTA's one-year statute of limitations. If Mason began making transfers "[f]rom at least on or

[12] Given the analysis herein, the Court need not reach whether the praecipe, which initiated the lawsuit by summoning the defendants but is not itself a complaint, *see* Pa. R. Civ. P. 1007, qualifies as a "pleading" for purposes of the relation-back doctrine. Nor need the Court reach at this point whether equitable tolling applies.

about February 2007" as alleged, Am. Compl. ¶ 41, then it appears that the statute of limitations has expired for at least some transactions.

A motion to dismiss premised on a statute-of-limitations defense "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989); *see also Griffin v. Carnes*, 72 F.4th 16, 21 (2d Cir. 2023) ("[A] statute of limitations dismissal at the motion to dismiss stage is appropriate where the complaint's untimeliness is apparent on its face."). From the allegations in the Amended Complaint, it is not apparent that all allegedly unlawful transfers occurred prior to March 12, 2024, that is, one year before the Pennsylvania complaint was filed. Plaintiffs allege that Mason made unauthorized transfers "[f]rom at least on or about February 2007 through the end of 2024," Am. Compl. ¶ 41, but that end date seems dubious given that Plaintiffs initiated this action prior to the "end of 2024" by filing a praecipe in the Court of Common Pleas on August 15, 2024. Dkt. 1-3. But even so, any authorized transfers between March 12, 2024 and August 15, 2024 would be timely. Crediting the allegations in the Amended Complaint and drawing all reasonable inferences in Plaintiffs' favor, it is plausible that some unauthorized transactions occurred after March 12, 2024. Thus, at this stage, the Court declines to dismiss Plaintiffs' EFTA claim as untimely. *Cf. Scales v. N.Y. Hotel & Motel Trades Council, Loc. 6*, No. 21 Civ. 8142 (JPC), 2023 WL 1779617, at *6 (S.D.N.Y. Feb. 6, 2023) (declining to dismiss a claim on statute-of-limitations grounds where the plaintiff's pleadings lacked specificity as to relevant dates).

**3. Violation of the TILA (Count VII)**

Plaintiffs' TILA claim in Count VII is premised on Mason's "successive renewals of the fraudulent line of credit." Am. Compl. ¶ 120. Plaintiffs allege that "J.P. Morgan failed to notify

the Tulins of fraudulent activity, and overlooked obvious red flags in the paperwork submitted in connection with such transaction." *Id.* ¶ 123. Again, these allegations of failing to provide notifications and overlooking red flags do not sound in fraud and thus Rule 9(b)'s heightened pleading standard does not apply to this claim. *Loreley Fin. (Jersey) No. 3*, 797 F.3d at 171 (quoting *Lerner*, 459 F.3d at 290-91); *See Rombach*, 355 F.3d at 171.

Defendants argue that Plaintiff's TILA claim is time-barred. Motion at 19. "Private actions based on violations of TILA must be brought 'within one year from the date of occurrence of the violation.'" *Latouche v. Wells Fargo Home Mortg. Inc.*, 752 F. App'x 11, 12-13 (2d Cir. 2018) (citing 15 U.S.C. § 1640(e)). "District courts in this circuit have measured the start of the TILA's statute of limitations from the point at which a consumer would reasonably have been put on notice that a violation had occurred." *Bernstein*, 775 F. Supp. 3d at 713 (citation modified).

Defendants' argument that Plaintiffs' TILA claim is time-barred is unpersuasive at this stage as well. Plaintiffs alleged that they were put on notice of the violation in 2024, when they were contacted by the FBI. Am. Compl. ¶ 33. Plaintiffs' filing of their complaint in Philadelphia County court on March 12, 2025 was plausibly within one year of receiving notice. Dkt. 1-1. And as with the EFTA claim, the Amended Complaint's TILA claim relates back to the original complaint under Rule 15(c)(1)(B) because the claim arises out of the same conduct—here, renewing the line of credit—that was alleged in the original complaint. *Compare* Dkt. 1-1 ¶¶ 16-65, *with* Am. Compl. ¶¶ 22-74. Therefore, the Court cannot conclude at this stage that Plaintiffs' TILA claim is time-barred.[13]

[13] Because the Court denies the motion to dismiss Plaintiffs' TILA claim on statute-of-limitations grounds, it declines to address whether equitable tolling would apply. *See* Am. Compl. ¶ 122 (alleging that Plaintiffs' TILA claim is subject to equitable tolling because Defendants "fraudulent[ly] conceal[ed]" Mason's fraudulent activity, despite allegedly "induc[ing] the Tulins to believe that their accounts were monitored by a sophisticated system").

**4. New York General Business Law Section 349 (Count IX)**

Lastly, in Count IX, Plaintiffs plead a violation of New York General Business Law Section 349. They allege that Defendants "advertised its fraud monitoring to induce potential customers to sign up for and to maintain their accounts" and gave them "personal assurances . . . that their assets and accounts would be well-protected," yet Defendants failed to in fact engage in fraud monitoring. Am. Compl. ¶¶ 136-138. The Second Circuit has been clear that "an action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b), but need only meet the bare-bones notice-pleading requirements of Rule 8(a)." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (internal citations omitted). This is so, the Second Circuit reasoned, because actions under Section 349 do not require proof of actual reliance and extend well beyond common-law fraud to cover a broad range of deceptive practices. *Id.* Therefore, Rule 9(b)'s heightened pleading standard does not apply to this claim.

Section 349 prohibits the "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). This law extends a private right of action to "any person who has been injured by reason of any deceptive act or deceptive practice made unlawful by this section." *Id.* § 349(h). A plaintiff must prove three elements to establish a Section 349 claim: "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014). Defendants argue that Plaintiffs have not demonstrated that Defendants made any statements that were deceptive or misleading under Section 349, and that Plaintiffs, as Pennsylvania residents without any relevant connection to New

York, cannot bring a claim under Section 349. Motion at 23-24. The Court starts and ends with the latter argument.

Recall that Section 349 prohibits the "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service *in this state*," referring to the State of New York. N.Y. Gen. Bus. Law § 349(a) (emphasis added). The New York Court of Appeals "interpret[s] the limiting phrase 'in this state' in sections 349(a) and 350 to require that 'the transaction in which the consumer is deceived . . . occur in New York.'" *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 122 (2d Cir. 2013) (citing *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002)). Defendants argue that Plaintiffs have not sufficiently alleged that the transactions at issue occurred in New York and that the Promissory Note's forum selection clause is insufficient to allow them to bring a Section 349 claim. Motion at 24 (citing *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 547-48 (S.D.N.Y. 2014)). In Defendants' view, Plaintiffs "have not—and cannot—allege any relevant New York connection, residence, visit, account, or transaction." *Id.*

Plaintiffs rely on *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 123 (2d Cir. 2013), in response. Opposition at 23. Plaintiffs argue that, in *Cruz*, the Second Circuit held that the plaintiff could bring a Section 349 action where the defendant "required all customer communications to be sent to its New York office, the contract at issue specified that New York law governed all disputes between the parties, and the contract required all suits relating to the contract to be adjudicated in state or federal courts in New York." *Id.* (citing *Cruz*, 720 F.3d at 123-24). Plaintiffs analogize *Cruz* to this case, reasoning that the Promissory Note required all suits to be brought in state or federal court in New York, was governed by New York law, and listed a New York address for receiving notices. *Id.*

Plaintiffs' characterization of *Cruz* is incomplete, however. The *Cruz* defendant, an online foreign currency exchange trading platform, made its payments in New York and "refuse[d] to disburse funds from customer accounts until it receive[d]" a specific form at its New York office. 720 F.3d at 123. Therefore, "some part of the underlying transaction" at issue in that case "occurred in New York State." *Id.* at 124 (citation modified). The requirement by the defendant in *Cruz* that "all customer communications" be sent to its New York office also is a far stronger connection to New York than J.P. Morgan's mere provision of a New York address for the receipt of notices in this case. Indeed, the Amended Complaint makes no references to the State of New York outside of listing Defendants' offices and maintaining that New York is the proper venue for this suit. Am. Compl. ¶¶ 14, 15, 18, 20. Based on their allegations, Plaintiffs are unable to bring a Section 349 claim and Count IX therefore is dismissed.

### D. Leave to Amend

Lastly, the Court considers whether to grant leave to amend. Defendants request dismissal of the entire Amended Complaint with prejudice. Motion at 24; Reply at 12. Plaintiffs ask, should any claims be dismissed, that they be granted leave to amend. Opposition at 24 & n.14. Under Federal Rule of Civil Procedure 15, a "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend is thus "liberally granted." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008). Because several of Plaintiffs' claims survive, Defendants would not be unduly prejudiced by another amendment and are on notice as to the basic circumstances of Plaintiffs' claims. Plaintiffs are therefore granted leave to amend.

## IV. Conclusion

For the foregoing reasons, the Court grants the motion to dismiss Counts I, II, III, IV, VI, and IX without prejudice and with leave to amend within thirty days. The Court denies the motion

to dismiss Counts V, VII, and VIII. Because the Court can resolve the motion to dismiss without oral argument, the parties' requests for oral argument, Dkts. 40, 42, are denied as moot. The Clerk of Court is respectfully directed to terminate the motions pending at Docket Numbers 37, 40, and 42.

SO ORDERED.

Dated: September 30, 2026
New York, New York

JOHN P. CRONAN
United States District Judge